UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

WENDY BINION,                                     Case No. 09-CV-0459 (PJS/AJB)

          Plaintiff,

v.                                                                      ORDER

CITY OF ST. PAUL, a government entity and
political subdivision of the state of
Minnesota; OFFICER "A," HELMET S758;
OFFICER "B," HELMET S799; OFFICER
"C," HELMET S757; OFFICER "D,"
HELMET S497; OFFICER "E," HELMET
S713; OFFICER "F," HELMET S317;
OFFICER "G," HELMET S80; OFFICER
"H," HELMET S369; OFFICER LYNN
MAHNKE; OFFICER LEE VANG; KEVIN
W. REINKE; ERIC SKOG; COMMANDER
STEVEN FRAZER; OFFICER SASS,
BADGE #325550; OFFICER ANN
BEBEAU; KENT CLEVELAND; OFFICER
HOLTZ; OFFICER COLLEEN LUNA;
RYAN JOSEPH; all in their individual
capacities as St. Paul Police Officers,

          Defendants.

---

Peter J. Nickitas, PETER J. NICKITAS LAW OFFICE, LLC; Theodore D.
Dooley, TED DOOLEY LAW OFFICES, LLC, for plaintiff.

Jon K. Iverson, Jason M. Hiveley, Stephanie A. Angolkar, IVERSON REUVERS,
LLC, for defendants.

Wendy Binion brings claims under federal and state law against the City of St. Paul ("the

City") and 19 named and unnamed St. Paul police officers.  Binion's claims arise out of her

arrest during the 2008 Republican National Convention.  Defendants move for summary

judgment on all of Binion's claims.  For the reasons stated below, defendants' motion is granted in part and denied in part.

## I.  BACKGROUND

Binion lives in Portland, Oregon and contributes to Portland Indymedia, an Internet-based news source that posts content submitted by members of the general public.  Binion Dep. 38-39, 48-49.  In the fall of 2008, Binion traveled to St. Paul at her own expense to document protests at the Republican National Convention, which was held from September 1 through September 4.  Binion Dep. 77; Frazer Aff. ¶ 2.

On the first day of the convention, City police officers encountered protestors throwing rocks, bottles, urine, and feces.  Frazer Aff. ¶ 3.  Binion spent that day videotaping and was pepper-sprayed three times.  Binion Dep. 87-88, 96.  On the second day of the convention, a "Poor People's Economic Campaign March" was scheduled for the late afternoon.  Binion Dep. 103.  The march was to start in Mears Park and, according to the march permit, was to proceed north, loop around the Capitol, and then come back into downtown.  Frazer Dep. 49.

Defendant Steven Frazer, a police commander for the City, was in charge of a division of law-enforcement officers assigned to monitor the march.  Frazer Aff. ¶ 4.  Frazer's division was responsible for blocking the west and south edges of Mears Park to make sure that the march stayed on the permitted route.  Frazer Dep. 49.  Frazer had been told that some members of the crowd were planning to break off from the march, head west into downtown St. Paul, and damage property.  Frazer Dep. 52-53.  Frazer and his officers were dispatched to the park at about 4:30 p.m.  Frazer Dep. 48.

Binion had arrived in Mears Park about 90 minutes earlier, and had spent her time videotaping the crowd gathered there.  Binion Dep. 104.  Binion was wearing a black helmet and a utility vest with numerous pockets; in her vest, she was carrying, among other things, batteries for her camcorder.  Binion also wore a laminated identification card that bore her photograph and the caption "PRESS."  Gerlicher Aff. Ex. A.

Shortly before 5:00 p.m., Senior Commander Joe Neuberger, who was stationed at the command center in the Ramsey County Law Enforcement Center, was notified of the presence of a white female in the crowd at Mears Park who was wearing a black helmet and carrying two bricks in a vest.  Neuberger Aff. ¶ 4.  Neuberger does not recall who gave him this information, but he surmises that it must have been a law-enforcement officer because (1) the radio recordings for that day do not include any such communication, so he must have received the information over the landline, and (2) only law-enforcement officials had the phone numbers for the landline. Neuberger Aff. ¶ 4.  (Conversations over the landline were not recorded.)   Based on the information that he was given, Neuberger broadcast the following officer-safety alert:

> There's a white female with a big red sign, has a black helmet and fishing vest.  She's got two bricks inside of her fishing vest.  She appears to be alone.  As the march moves, be aware in officer safety.

Neuberger Aff. Ex. 1 at 10:51.

Frazer heard Neuberger's radio alert about a woman carrying bricks.  Frazer Aff. ¶ 7. Frazer suspected that the woman intended to start a riot, and thus Frazer ordered his officers to find and detain her.  Frazer Aff. ¶¶ 8-9.  At about 5:30 p.m., the officers saw Binion, who, as noted, was wearing a black helmet and a utility vest.  Gerlicher Aff. ¶¶ 2-3 & Ex. A.  At the time

-3-

that she was spotted by the officers, Binion was walking toward the perimeter of the park to use the restroom.  Binion Dep. 107.  A group of police officers converged on Binion and arrested her. Binion Dep. 107.  Initially, Binion was facing the officers, but the officers circled around Binion and grabbed at pressure points on her wrists, elbows, shoulder blades, and neck.  Binion Dep. 108.  Binion could not tell how many officers were grabbing her.  Binion Dep. 108.  The officers held Binion's hands above and behind her head and began walking Binion backward toward a squad car.  Binion Dep. 108-09.  Binion does not know which particular officers had physical contact with her during the arrest.  Binion Dep. 129.

The timeline of events becomes somewhat confused at this point, but within three to five minutes after arresting Binion, the arresting officers determined that she was not carrying bricks or any other weapons.  Frazer Dep. 61, 64, 66.  According to Frazer, after the officers arrested Binion, they were surrounded by a crowd chanting, "Let her go."  Frazer Aff. ¶ 13.  Before the officers had a chance to finish searching Binion, the crowd forced the officers to move somewhat east and north.  Frazer Dep. 64-65.  The crowd threw bags of urine as well as rocks and bricks at the officers.  Frazer Aff. ¶ 14; Frazer Dep. 64.  Frazer heard people in the crowd planning to team up and "unarrest" Binion.  Frazer Dep. 68.  Neuberger relayed similar information to Frazer over the radio.  Frazer Dep. 68.  Frazer also saw a group unfurling a tarp or trash bag, which, according to Frazer, is a tactic used by protestors to shield themselves from chemical irritants while they attempt to break through a police formation.  Frazer Dep. 68-69.

For her part, Binion described a somewhat less chaotic scene.  In her testimony, Binion did not mention being searched, but attested that, after her arrest, "[t]he crowd kind of rushed in," and she could hear the crowd "shouting a little."  Binion Dep. 109.  The officers formed a

perimeter around her and continued walking her backward.  Binion Dep. 109.  Binion was cuffed

with plastic zip ties and brought to a squad car, where the officers held her for a short time while

Binion shouted her name to the crowd.  Binion Dep. 109.  The officers then put metal cuffs on

her and put her in the back of the squad car.  Binion Dep. 109-10.  Binion did not describe being

forcibly moved along with the crowd, nor did she testify that anything was thrown at the officers.

The parties have also submitted a number of videos of the crowd, but none of them appears to

depict the crowd forcing officers to move or throwing anything at the officers.

After Binion was placed in the squad car, she was driven to what she describes as a

military checkpoint, where the officer accompanying her spoke to what she describes as military

police.  Binion Dep. 111.  Binion was then driven to the basement of the Ramsey County Law

Enforcement Center where she was booked for "conspiracy to commit riot."  Binion Dep. 111-

12; Nickitas Decl. Ex. 6.  Binion was released at about 9:45 p.m. that evening.  Binion Dep. 116.

Binion suffered quarter-size bruises and a sore arm from her arrest.  Binion Dep. 113.

The day after her arrest, Binion sought help from a woman at the North Star Health Collective.[1]

Binion Dep. 113.  The woman opined that Binion had a splinter fracture in her right forearm and

wrapped it in an Ace bandage.  Binion Dep. 113, 115.  But no x-rays were taken, and Binion does

not know whether the woman had any medical training.  Binion Dep. 113-14.  Binion has no

evidence — save her recollection of the unidentified woman's comment — that she suffered a

splinter fracture.  Binion Dep. 114-15.  Binion also admits that she is not qualified to diagnose a

splinter fracture.  Binion Dep. 116.  Binion sought no further care for her sore arm.

---

[1]The record does not reveal exactly what the North Star Health Collective was, but Binion
testified that it included a "collection of naturopaths, doctors, nurses."  Binion Dep. 114.

After Binion's release, officers returned some of her personal property, but did not return her debit card or media equipment.  Nickitas Decl. Ex. 25 at 10.  Binion asked about these items and was told to go to another facility to retrieve them.  Nickitas Decl. Ex. 25 at 10.  Binion decided not to go to the other facility because she did not want to cross what she characterizes as a military checkpoint.  Nickitas Decl. Ex. 25 at 10-11.  Binion's remaining property was returned to her about eight weeks later.  Binion Dep. 33, 37.  Her camera was damaged.  Binion Dep. 37-38.

In January 2009, an officer met with prosecutors from the City attorney's office and was told that the charges against Binion had been dismissed for lack of evidence.[2]  Nickitas Decl. Ex. 16 at 3.  Binion filed this action in February 2009.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.

---

[2]It is not clear whether Binion was ever formally charged with a crime.  Frazer testified that she was never issued a citation.  Frazer Dep. 87.

*B.  The Parties*

In her amended complaint, Binion names the City and 19 individual police officers as defendants.  Some of the individual defendants are identified by name and others are identified by helmet number.  In her brief opposing summary judgment, Binion agrees to the dismissal of her claims against all but one of the individual defendants, and Binion purports to name a slew of additional individual defendants.  *See* Docket No. 27 at 5.  Binion claims that she is merely identifying by name the officers who were previously identified by helmet number.

It is not clear to the Court that these newly named officers have properly been made parties to this action.  *Cf. Hinnenkamp v. City of St. Cloud*, 178 Fed. Appx. 620, 621 (8th Cir. 2006) (affirming summary judgment against pro se plaintiff on the ground that the individual defendants were merely identified in plaintiff's briefing but never named in a pleading, listed on the docket, or served with process).  But defendants did not file a reply brief and have not objected to or even addressed Binion's belated attempt to name the previously unnamed defendants in this lawsuit.[3]  For all the Court is aware, these newly named defendants were properly served under the aliases listed in the docket.

Given these unusual circumstances, the Court will address Binion's claims against these newly named officers on the merits, but without prejudice to the officers' ability to argue that

---

[3]In their brief, defendants argue that the "unnamed and unrelated officers" should be dismissed.  Docket No. 23 at 7.  Although defendants' argument mentions in passing that Binion failed to amend her complaint to name the unnamed officers, defendants do not explain the legal consequences of this failure, nor do they cite any authority for the proposition that the failure to substitute the proper name of a party sued under an alias should automatically lead to dismissal. Instead, the thrust of defendants' argument for dismissal is that Binion's complaint contains insufficient factual allegations to state a claim against these officers.  To the extent that defendants seek dismissal on this ground, their motion is denied.

they have not been made parties to this lawsuit.  The Court will not order that the docket be amended to substitute the names of these newly named officers until Binion provides proof of service or otherwise explains why these individuals are properly before the Court.  Pursuant to Binion's brief, all claims against the named individual defendants (except for Steven Frazer) will be dismissed with prejudice and on the merits.[4]

### C.  Monell Claims

Binion brings various constitutional and state-law claims against the individual defendants, each of whom is sued in his or her individual capacity.  Binion seeks to hold the City vicariously liable on her state-law claims and also brings two direct claims against the City: a state-law negligence claim and a claim under the Privacy Protection Act, 42 U.S.C. § 2000aa.  Binion did not, however, plead any constitutional claims against the City, nor did she include any allegations that would provide a basis for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Binion nevertheless states in her brief that she is suing the officers in their individual *and* official capacities.  A suit against an officer in his official capacity is a suit against the municipal employer.  *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  Thus, despite clearly indicating in her complaint that she was *not* asserting any constitutional claims against the City, Binion now attempts to pursue such claims in her brief.

---

[4]One of the defendants named on the docket is "Ryan Joseph."  It appears that the proper name of this defendant is Joseph Ryan.  Joseph Ryan is one of the newly named officers in Binion's brief.  The Court will dismiss all claims against "Ryan Joseph," as there appears to be no such person, and will place Joseph Ryan on the docket when and if Binion meets the conditions outlined above.

According to the pretrial scheduling order, motions to amend the complaint to add new claims had to be served no later than August 31, 2009.  Docket No. 6 at 2.  Binion served her brief purporting to add new claims on September 22, 2010, over a year after that deadline, and well after the close of discovery.  The Court will not permit Binion to circumvent the scheduling order in this manner.  The Court holds that Binion may not pursue any constitutional claims against the City.

### D.  Unreasonable Seizure

Binion claims that she was arrested without probable cause in violation of the Fourth Amendment.  As a general matter, the Fourth Amendment requires that a police officer making an arrest have a warrant or probable cause.  "Probable cause to conduct a warrantless arrest exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested."  *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001).

If a police officer does not, in fact, have actual probable cause to arrest a suspect, he is nevertheless entitled to qualified immunity if he has "arguable" probable cause — that is, if he reasonably (but wrongly) *believes* that he had probable cause.  "In the wrongful arrest context, officers are entitled to qualified immunity 'if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

Binion was booked for "conspiracy to commit riot."  Nickitas Decl. Ex. 6.  More precisely, Binion was booked for conspiracy to commit second-degree riot.[5]  Under Minnesota law, second-degree riot is defined as follows:

> When three or more persons assembled disturb the public peace by an intentional act or threat of unlawful force or violence to person or property, each participant who is armed with a dangerous weapon or knows that any other participant is armed with a dangerous weapon is guilty of riot second degree and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both.

Minn. Stat. § 609.71, subd. 2.  The elements of second-degree riot are (1) the defendant was one of three or more persons assembled together; (2) the assembled persons disturbed the public peace by an intentional act or threat of unlawful force or violence to person or property; and (3) the defendant was armed with a dangerous weapon or knew that another participant was armed with a dangerous weapon.  *See* 10 Minn. Prac., Jury Instr. Guides Crim. § 13.115 (5th ed.).

The Court has little trouble concluding that the officers would have been justified in conducting a "*Terry* stop" on Binion — that is, briefly detaining and patting down Binion to determine whether she was armed with bricks.  *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (where an officer has reasonable grounds to believe that a person is engaged in criminal activity, an

---

[5]Minnesota law recognizes three degrees of riot: first, second, and third.  Minn. Stat. § 609.71.  First-degree riot is a riot resulting in a death, Minn. Stat. § 609.71, subd. 1, and no one claims that Binion was involved in such a riot.  Third-degree riot is a misdemeanor.  *See* Minn. Stat. § 609.71, subd. 3 (setting penalty for third-degree riot as "imprisonment for not more than one year"); Minn. Stat. § 609.02, subd. 2 (defining "felony" as "a crime for which a sentence of imprisonment for more than one year may be imposed").  Binion's counsel characterized Binion's alleged crime as "felony riot."  *See* Docket No. 27 at 3, 16.  Likewise, Frazer testified that Binion was brought in on felony-level charges.  Frazer Dep. 87.  By a process of elimination, then, the Court concludes that Binion was suspected of conspiracy to commit second-degree riot.

officer may briefly detain the person for investigative purposes and, where there are reasonable grounds to believe that the person is armed, frisk the person); *see generally United States v. Flores-Sandoval*, 474 F.3d 1142, 1144 (8th Cir. 2007) (describing three categories of police encounters: (1) consensual encounters; (2) *Terry* stops, which must be supported by reasonable suspicion; and (3) full-scale arrests, which must be supported by probable cause).  According to the information given to the officers, a white female (Binion was a white female) who was wearing a black helmet (Binion was wearing a black helmet) and a fishing vest (Binion was wearing a vest that closely resembled a fishing vest) was carrying bricks (Binion was carrying heavy objects — in particular, camcorder batteries) in the midst of a large crowd that was preparing to participate in a political march.  The march was taking place during a national political convention that had already been marred by vandalism and unruly mobs.  And the officers had been informed that some people in the crowd intended to break out of the planned route and destroy property in downtown St. Paul.  Under these circumstances, the officers would have had reasonable grounds to conduct a *Terry* stop on Binion.

The problem, though, is that the officers did *not* conduct a *Terry* stop.  Instead, they descended on Binion en masse and immediately arrested her — without asking her questions, frisking her, or otherwise determining if she was carrying bricks.[6]  According to law that was clearly established at the time of Binion's arrest, the officers had a duty to reasonably investigate *before* arresting Binion.  "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent

---

[6]Importantly, the officers do not dispute that they immediately detained Binion under conditions that qualify as a full-scale arrest.

circumstances and so long as 'law enforcement would not [be] unduly hampered . . . if the agents . . . wait[ ] to obtain more facts before seeking to arrest.'" *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (quoting *United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir. 1987)) (holding that officer was not entitled to qualified immunity where he spoke to the plaintiff for no more than 20 seconds, refused to interview one of the witnesses, and ignored plainly exculpatory evidence). Further, evidence that the officers would have discovered if they *had* conducted a reasonable investigation is relevant to whether the officers had probable cause. "Officers are not required to conduct a 'mini-trial' before arrest, but probable cause 'does not exist when a 'minimal further investigation' would have exonerated the suspect.'" *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) (quoting *Kuehl*, 173 F.3d at 650).

Before arresting Binion, the police had been told that a number of participants in the march were planning to break off and damage property in downtown St. Paul. But this did not, in and of itself, give the officers probable cause to arrest Binion or anyone else. It is well established that mere proximity to criminal activity does not provide probable cause to arrest. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *United States v. Young*, 184 F.3d 781, 783 (8th Cir. 1999); *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983); *cf. Barham v. Ramsey*, 434 F.3d 565, 573-74 (D.C. Cir. 2006) (scattered acts of lawlessness observed during demonstration did not create probable cause to arrest everyone in the park where pedestrian traffic moved freely in and out of the park).

Of course, before arresting Binion, police had also been told that a white female wearing a black helmet and fishing vest and carrying a big red sign was carrying two bricks. As already discussed, that information would have given police the right to conduct a *Terry* stop of Binion.

-12-

But it did not provide probable cause to arrest her.  First, the police did not know the source of

the information; although they could have surmised that the information was called in to the

command center by a law-enforcement officer, they were not told whether the law-enforcement

officer had personally witnessed the woman carrying the bricks, or instead was relaying

information that he had been given by someone else.[7]  Second, Binion did not entirely fit the

description of the brick-carrying woman, as she did not have a "big red sign."  Finally, and most

importantly, "a 'minimal further investigation' would have exonerated [Binion].'"  *Amrine*, 522

F.3d at 832 (quoting *Kuehl*, 173 F.3d at 650).  After all, Binion was accused of carrying *bricks*.

Unlike, say, a pocket knife or an Ecstasy tablet or a stolen coin, a brick is not easily concealed.  It

would have taken the police mere seconds to discover that Binion was not carrying a brick.

Because a quick pat down would have exonerated Binion, and because the police did not do a

quick pat down, "probable cause '[did] not exist.'"  *Id.* (quoting *Kuehl*, 173 F.3d at 650).

That is not the end of the inquiry, however.  The Eighth Circuit has said that, in exigent

circumstances, officers may be justified in arresting a suspect without conducting even a minimal

---

[7]To be sure, officers are permitted to act on information provided by other officers and "'cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.'"  *United States v. Hensley*, 469 U.S. 221, 231 (1985) (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)).  Furthermore, officers who rely on information provided by other officers may be entitled to qualified immunity.  *Id.* at 232 ("If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.  In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit.").  But here, the officers on the scene learned an additional fact not known to the unknown officer who first reported the presence of a woman carrying bricks — namely, that Binion was not carrying bricks.  Once the officers discovered this exculpatory information, they were not entitled to ignore it and proceed as if probable cause existed.  *Cf. Kuehl*, 173 F.3d at 650 (" An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.").

investigation.  *See Kuehl*, 173 F.3d at 650.  The officers argue that an immediate arrest was

necessary in Binion's case because they were surrounded by a large, angry crowd.  There is

certainly evidence in the record that, *after* Binion's arrest, the surrounding crowd became hostile

and aggressive.  But there is no evidence of any hostility or aggression, or any other exigency,

*before* Binion was arrested.  Frazer testified that his unit was sent to Mears Park as a preventative

measure in light of reports that people in the crowd were planning to leave the permitted route

and damage property downtown.  Frazer Dep. 52-53.  But Frazer did not testify that anything

untoward was happening before Binion was arrested.  For her part, Binion testified that the

atmosphere was peaceful:

> It was a very picnic-like atmosphere.  We're in a public park.
> There was people dancing.  There was keynote speakers.  There
> was people eating.  There was a big spread of food.  People seemed
> to be fairly jovial.  It didn't seem like there was anything wrong
> happening.

Binion Dep. 110.  Moreover, any claim of exigency is undermined by the fact that, before leaving

the scene, the officers were able to ascertain that Binion did not have any bricks.  They were also

able to question her to some extent.  Although the record is not clear, Binion provided at least her

name and possibly some other information before being taken away.  Frazer Dep. 60-61 ("Q:

And I believe she gave you her name and everything? A: Correct.").

The officers bear the burden of proving facts demonstrating that they are entitled to

qualified immunity.  *See White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).  Based on the

current record, the Court cannot find that the officers have carried their burden, and thus the

Court must deny their motion for summary judgment on Binion's unreasonable-search claim.

This is not to say that the officers cannot carry their burden at trial.  The record submitted to the

Court is not well developed, and, at this point, the Court must resolve any disputes in Binion's favor. Evidence that is not now before the Court will undoubtedly be introduced at trial — and, of course, the jury will not be required to accept Binion's version of events. It is entirely possible that the officers will be able to prove that it was not safe for them to conduct a pat-down search before arresting Binion, or that, even had they conducted a pat-down search and discovered that Binion was not carrying bricks, other information would have given them arguable probable cause to arrest Binion.[8]  All of that must await trial, however.

### E.  Excessive Force

Binion brings a claim of excessive force. She contends that the officers' use of pressure points as they forcibly marched her to the squad car caused bruising and a splinter fracture in her right arm. But Binion admitted during her deposition and at oral argument that she cannot identify the officers who actually caused the injuries. Liability under § 1983 is personal, and each defendant's conduct must be independently assessed. *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006). Although in some circumstances it is possible to recover against an officer who did not personally use excessive force if that officer failed to prevent *another* officer's use of excessive force, *see Nance v. Sammis*, 586 F.3d 604, 611-12 (8th Cir. 2009), Binion has not

---

[8]The Court notes that Frazer testified that Binion resisted arrest and that, when she first saw the officers, she tried to run away. If this is true, the officers may have had arguable probable cause to arrest her. *See Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003) (officers had probable cause to continue to detain suspect even after they were told that there was no warrant for his arrest because the suspect resisted arrest); *Kelly v. Bender*, 23 F.3d 1328, 1330 (8th Cir. 1994) ("We further conclude that the officers' preexisting reasonable suspicion coupled with Kelly's flight constituted arguable probable cause to arrest Kelly for disorderly conduct."); *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995). But as Frazer's account contradicts Binion's account, the officers have quite properly not relied on it in moving for summary judgment. Resolution of this issue must therefore await trial.

made such a claim in this action.  In light of her inability to identify which officers used force

against her, Binion's excessive-force claim must fail.

Moreover, even if Binion could identify the officers who touched her, the Court would

grant summary judgment to those officers.  As noted earlier, the officers had reasonable

suspicion to justify a *Terry* stop of Binion.  Consequently, the officers had the right to use some

degree of force to effect the stop.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our

Fourth Amendment jurisprudence has long recognized that the right to make an arrest *or*

*investigatory stop* necessarily carries with it the right to use some degree of physical coercion or

threat thereof to effect it." (emphasis added)).  Whether the force used was reasonable depends

on such circumstances as the severity of the crime, whether the suspect posed a threat, and

whether the suspect was resisting arrest.  *Id.*  Furthermore, "[t]he calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the

amount of force that is necessary in a particular situation."  *Id.* at 396-97.

Binion offers only inadmissible evidence — specifically, an out-of-court statement made

by an unidentified person with no known medical training — in support of her claim that she

suffered a splinter fracture.  And Binion's remaining injuries (a sore arm and small bruises) are

de minimis.  *See Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) ("a de

minim[is] use of force or injury is insufficient to support a finding of a constitutional violation").

Even setting aside the de minimis nature of Binion's injuries, the minimal use of force was

reasonable in light of the officers' initial reasonable suspicion that Binion was armed with bricks.

*Cf. Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (describing "physical

pressure administered on the demonstrators' limbs in increasing degrees, resulting in pain" as "less significant than most claims of force" and noting that officers "are not required to use the least intrusive degree of force possible").  True, the officers soon discovered that Binion was not carrying bricks, but there is no evidence that the officers caused physical harm to Binion *after* making this discovery.  The Court therefore grants the officers' motion for summary judgment on Binion's excessive-force claim.

*F.  First Amendment*

Binion next claims that the officers violated the First Amendment by arresting and detaining her.  Although her complaint is vague about the nature of this claim, her brief makes clear that she is asserting that defendants acted in retaliation for her exercise of rights protected by the First Amendment.

To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) that she engaged in protected activity; (2) that the defendant took adverse action against her that would chill a person of ordinary firmness from engaging in that activity; and (3) causation — that is, that the defendant took such action in retaliation for the protected activity.  *See Zutz v. Nelson*, 601 F.3d 842, 848-49 (8th Cir. 2010).  The defendant's retaliatory motive must be a but-for cause of the retaliation; a plaintiff cannot recover if the defendant would have taken the same action even in the absence of any improper motive.  *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007).

Binion claims that the officers arrested her because she is an independent reporter who was documenting protestors at the convention.  There is certainly evidence that Binion was engaged in protected activity and that she suffered an adverse action.  But Binion does not have

sufficient evidence of causation to survive summary judgment.  Binion was arrested after officers heard a radio warning describing a white woman wearing a black helmet and a fishing vest carrying bricks.  There is no dispute that Binion generally fit that description, and there is no dispute that the radio warning said nothing about Binion being a reporter.  To the contrary, the radio warning described the woman as carrying a "big red sign" — conduct that a journalist covering the march would be unlikely to engage in.

Binion claims that she was under surveillance while at the convention and points to photos of her that were taken by police on the first day.  It appears, though, that the police were simply monitoring the crowds gathered in St. Paul during the convention; there is no evidence that the police singled out Binion.  Moreover, even if the police were actually surveilling Binion — as opposed to randomly catching her on camera while taking shots of crowds — Binion has no evidence of any connection between that surveillance and her arrest.[9]  There is no evidence that the law-enforcement officer who called in the warning about the brick-carrying woman, the law-enforcement officer who relayed that warning, or the law-enforcement officers who arrested Binion had ever looked at a single photograph of Binion or had any idea who Binion was.

Binion also points to the fact that, when she was arrested, she was carrying a camera and wearing visible press credentials.  But the radio warning did not tell officers to look for anyone with those characteristics, and there is no evidence that Binion's camera or press credentials played any role in her arrest.  To the contrary, the numerous videos of the scene submitted by the

---

[9]The photos turned over in discovery were labeled "IMG_2796.jpg" and "IMG_2798.jpg."  *See* Nickitas Decl. Exs. 10, 11.  Binion speculates that "IMG" might stand for "Independent Media Group."  This is silly. "IMG" commonly appears in the names of digital image files.

parties demonstrate that dozens, if not hundreds, of people in the crowd were taking pictures of and videotaping the police.

On the record before the Court, no reasonable jury could find that Binion was arrested in retaliation for her exercise of First Amendment rights.  The Court therefore grants the officers' motion for summary judgment on this claim.

## G.  The Privacy Protection Act

Binion next brings a claim against the City under the Privacy Protection Act, 42 U.S.C. §§ 2000aa et seq.[10]  The Act "generally prohibits government officials from searching for and seizing documentary materials possessed by a person in connection with a purpose to disseminate information to the public." *Citicasters v. McCaskill*, 89 F.3d 1350, 1353 (8th Cir. 1996).  The Act provides protection for both "work product materials" and "documentary materials":

> Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication . . . .

> Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication . . . .

§ 2000aa(a), (b).  There are certain exceptions to the Act's prohibition of searches and seizures, including when "there is probable cause to believe that the person possessing such materials has

---

[10]All citations in this section are to Title 42 of the United States Code.

committed or is committing the criminal offense to which the materials relate . . . ."
§ 2000aa(a)(1), (b)(1).

Persons aggrieved by a violation of the Act may sue for actual and liquidated damages.
§ 2000aa-6(a), (f).  Individual officers are immune from liability if they had a reasonable belief in the lawfulness of their conduct, but government entities are not entitled to such immunity (except in circumstances not relevant here).  § 2000aa-6(b), (c).  As Binion asserts this claim only against the City, and not against the individual officers, immunity is not an issue.

The City raises several cursory arguments in favor of summary judgment on this claim:

First, the City argues that the probable-cause exception applies because there was probable cause to arrest Binion.  The Court disagrees, for reasons already explained.

Second, the City notes that the Act permits search and seizure in several other circumstances, such as when immediate seizure is necessary to prevent death or serious bodily injury or when there is reason to believe that using a subpoena to obtain the materials would result in their destruction or concealment.  But the City does not explain how those exceptions might apply in this case.

Third, the City argues that Binion's claim is fatally flawed because there is no evidence that the officers knew that she intended to disseminate the seized materials to the public.  There are two problems with this argument.  First, Binion was wearing press credentials and carrying a camera and videotapes.  A reasonable jury could find that this put the officers on notice that Binion intended to disseminate the videotapes to the public.  Second, although subsection (a) of § 2000aa applies when a person is "reasonably believed" to intend dissemination, subsection (b), which protects "documentary materials," does not contain similar language.  Perhaps

subsection (b), like subsection (a), imposes liability only when the seizing officer knows of the person's intent to disseminate, but the City has not cited any authority to that effect, nor has the City parsed the language of the statute to explain why it should be read that way.

Finally, the City argues that Binion's claim should be dismissed because she "had no subjective expectation of privacy in videotapes documenting public events." Docket No. 23 at 18. This argument is puzzling. The very purpose of the Privacy Protection Act is to protect materials that document matters of public interest. After all, the Act was passed in response to *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), in which the Supreme Court upheld the search of a newspaper office for materials depicting a violent clash between demonstrators and police at a university hospital — that is, a highly public event. *See In re Young*, 141 F.3d 854, 860 (8th Cir. 1998); *Zurcher*, 436 U.S. at 550-51, 567-68.

The City cites *McCormick v. City of Lawrence*, 289 F. Supp. 2d 1264 (D. Kan. 2003) to support its "expectation of privacy" argument, but its reliance on *McCormick* is misplaced. The *McCormick* plaintiffs did not bring a claim under the Privacy Protection Act. Instead, they claimed that their Fourth Amendment rights were violated when police officers viewed the content of plaintiffs' videotapes. *Id.* at 1265-66. The plaintiffs invoked the Privacy Protection Act in support of their argument that society has recognized a right to privacy in the contents of recordings of public events. *Id.* at 1268-69. In rejecting that argument, the *McCormick* court was not ruling on the elements of a claim under the Privacy Protection Act — as, again, no such claim was before the court. Instead, the court was addressing the scope of privacy interests protected by the Fourth Amendment. That issue is not presented in this case because Binion has

not claimed that any officer viewed her videotapes in violation of the Fourth Amendment.  The

City's motion for summary judgment on Binion's Privacy Protection Act claim is denied.

### H.  State Law Claims

#### 1.  Assault and Battery

Binion brings claims of assault and battery arising out of the officers' physical contact

with her during her arrest.  The Court grants summary judgment to defendants on these claims

for the same reason that the Court granted summary judgment to defendants on the excessive-

force claim — namely, because Binion cannot identify which officers touched her and because

the force used by the officers was reasonable under the circumstances.  *See Paradise v. City of*

*Minneapolis*, 297 N.W.2d 152, 155-56 (Minn. 1980) ("if the officers in this case used excessive

force, their touching of plaintiff would be unpermitted and thus constitute a battery"); *Adewale v.*

*Whalen*, 21 F. Supp. 2d 1006, 1016 (D. Minn. 1998) ("the use of force by an officer must be

excessive to constitute battery").[11]

#### 2.  False Arrest and False Imprisonment

Binion next brings claims of false arrest and false imprisonment.  "An arrest made

without proper legal authority is a false arrest, and any subsequent restraint is false

imprisonment."  *Adewale*, 21 F. Supp. 2d at 1016.  The Court has already held that Binion was

arrested without probable cause, and thus she obviously has a viable claim for false arrest and

false imprisonment.

---

[11]Binion does not identify any assaultive conduct other than that inherent in the alleged
battery.  Accordingly, the Court treats them as the same claim.  *See Paradise*, 297 N.W.2d at 155
n.3 (treating assault and battery claims as the same where it was "apparent that the essence of
plaintiff's claim is based on battery").

Defendants assert that they are entitled to official immunity on these claims.  Official immunity from state-law claims is analogous to, although different in some respects from, qualified immunity from federal-law claims.  "The doctrine of official immunity protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong." *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991).  In this context, malice means "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Id.* at 107 (citation and quotations omitted).

Because, as explained above, the Court cannot find that the officers had even arguable probable cause to arrest and detain Binion, the Court cannot find that the officers are entitled to official immunity.  A decision on this issue, like a decision on qualified immunity, will have to await the factual findings of the jury.  Defendants' motion for summary judgment on these claims is denied.

### 3.  Negligence

Finally, Binion brings a claim of negligence against the City.  Binion barely mentions this claim in her brief.  She has not addressed the City's argument that it did not owe her a duty of care, nor has she identified the source of the duty that she alleges was breached, nor has she pointed to anything in the record supporting a negligence claim.

This Court does not function as a research assistant for the parties.  If Binion is serious about her negligence claim, then it is her responsibility to brief it — and, in particular, to cite evidence in the record supporting it.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (where the nonmoving party will bear the burden of proof at trial, it must point to facts showing

that there is a genuine issue for trial in response to a motion for summary judgment); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in [the record]."). As she has failed to do so, the Court grants defendants' motion for summary judgment on Binion's negligence claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Defendants' motion for summary judgment [Docket No. 15] is GRANTED IN PART and DENIED IN PART.

2.   Defendants' motion is GRANTED with respect to the following claims and they are DISMISSED WITH PREJUDICE AND ON THE MERITS:

   a.   That portion of Claim I asserting a claim of excessive force under the Fourth Amendment;

   b.   Plaintiff's First Amendment claim (Claim II);

   c.   Plaintiff's battery claims (Claims IV and V);

   d.   Plaintiff's assault claims (Claims VI and VII);

   e.   Plaintiff's negligence claim (Claim XII).

3.   Defendants' motion is DENIED in all other respects.

4.      All claims against Officer Lynn Mahnke; Officer Lee Vang; Kevin W. Reinke;

Eric Skog; Officer Sass, Badge #325550; Officer Ann Bebeau; Kent Cleveland;

Officer Holtz; Officer Colleen Luna; and Ryan Joseph are DISMISSED WITH

PREJUDICE AND ON THE MERITS.


Dated: March  9, 2011                              s/Patrick J. Schiltz
                                                   Patrick J. Schiltz
                                                   United States District Judge